**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

SAMANTHA LINAMAN,

        Defendant.

No. 5:16-CR-4102-MWB

**REPORT AND RECOMMENDATION**

_____

### *TABLE OF CONTENTS*

I. INTRODUCTION ............................................................................... 1

II. PROCEDURAL HISTORY ................................................................. 2

III. RELEVANT FACTS .......................................................................... 3

IV. WHETHER THE SEIZURE VIOLATED LINAMAN'S RIGHTS .................. 9

V. WHETHER SUPPRESSION IS AN APPROPRIATE REMEDY ................... 20

VI. CONCLUSION .............................................................................. 21

### I. INTRODUCTION

      In the early morning of December 8, 2016, a vehicle in which Samantha Linaman was a passenger was pulled over for a minor traffic violation. After issuing a warning to the driver, the officer sought consent to search the car, which was denied. Believing he had reasonable articulable suspicion to prolong the stop, the officer performed a drug-dog sniff of the vehicle. The canine alerted positively for the presence of drugs. A

subsequent search of the car unearthed a backpack containing more than twenty pounds of methamphetamine.

Linaman moves to suppress all evidence obtained as a result of the drug-dog sniff, arguing that the officer unreasonably extended the traffic stop in violation of the Fourth Amendment. Doc. 39.[1] The United States (the government) resists the motion. Doc. 40. I recommend **granting** Linaman's motion to suppress.

## II. PROCEDURAL HISTORY

On December 8, 2016, the government charged Linaman by criminal complaint, along with co-defendants Jose Angulo and Andrew Trimble, with one count of conspiracy to distribute a controlled substance. MJ Doc. 1. That same day, the defendants made their initial appearance in this court. MJ Doc. 9. The grand jury returned an indictment on December 13, 2016, charging Linaman, Angulo, and Trimble with conspiracy to distribute a controlled substance, in violation of 21 U.S.C. §§ 841 and 846, and possession with intent to distribute a controlled substance, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841. Doc. 4. The court originally scheduled trial for the two-week setting beginning on February 6, 2017. Doc. 14. On Linaman's unresisted motions, the court continued trial to April 3, 2017, and later, to May 1, 2017. Docs. 21, 22, 37, 38. Linaman filed the motion to suppress on March 10, 2017 (Doc. 39), and the government filed a resistance on March 20, 2017 (Doc. 40).

On April 5, 2017, I held a hearing on the motion to suppress. Doc. 42. The government presented testimony from Woodbury County (Iowa) Sheriff's Office Deputy

---

[1] "Doc." refers to the criminal docket in this case. "MJ Doc." refers to the docket in the predecessor case, 16-MJ-331-CJW.

Troy Tadlock. The government offered, and I admitted into evidence, three exhibits: dashboard camera video from Deputy Tadlock's patrol car (Exhibit 1) and video from Deputy Tadlock's body camera, split into two thirty-minute chunks (Exhibits 2A and 2B). After the hearing, Linaman submitted a brief in support of the motion (Doc. 44), and the government submitted a response (Doc. 45).

During the suppression hearing, Linaman moved to continue trial for sixty days based on the pending motion, and the government did not object. Doc. 42. I granted the motion to continue. Docs. 42, 43. Trial is now scheduled for the two-week setting beginning on July 10, 2017. Doc. 43.

## III.  RELEVANT FACTS[2]

Deputy Tadlock has been a law enforcement officer for more than seventeen years, fifteen of which have been as a canine handler. He primarily patrols interstates with his canine. He estimated that he has made 17,000 traffic stops during the course of his career. He has thrice attended a three-day criminal interdiction course with the Nebraska State Patrol, and he has completed all four phases of criminal interdiction training through a program called Desert Snow. He has also had training on interviews and interrogations.

Through his criminal interdiction training, Deputy Tadlock learned about source states and source cities for drugs. His training taught him that 85% of drugs in the United States come from the southern border and are then transported north and east. Large shipments of drugs are moved to hub cities—big metropolitan cities—near the southern border, such as Phoenix, Denver, and Las Vegas; they are then disbursed to northern

---

[2] The facts are taken from the dashboard camera video (Exhibit 1), the body camera video (Exhibit 2A), Deputy Tadlock's testimony, and the affidavit in support of the complaint in the related magistrate case (MJ Doc. 1).

hub cities, such as Minneapolis, Minnesota; Sioux City, Iowa; Worthington, Minnesota; and Omaha, Nebraska.

Deputy Tadlock worked his usual overnight shift on December 7, 2016, which was a cold night—less than twenty degrees—with even colder winds. A few minutes before midnight, Deputy Tadlock noticed a car that appeared to be speeding on northbound Interstate 29, just outside of Sioux City, Iowa. Deputy Tadlock began following the car to ascertain its speed. He determined that the car was not speeding. He continued to follow the vehicle, which had Minnesota license plates. At one point, the vehicle changed lanes at the last second to avoid exiting the highway. After this, Deputy Tadlock activated his dashboard camera. The vehicle briefly crossed the center line, which Deputy Tadlock pointed out in the dashboard camera video. Deputy Tadlock continued to follow the vehicle for seven more minutes. After it crossed the center line for a second time—again, slightly—Deputy Tadlock pulled the vehicle over using his red and blue lights. At various points while Deputy Tadlock was following the vehicle, it also crossed the fog line three times.[3]

Deputy Tadlock approached the passenger side of the vehicle. Both Linaman, the front seat passenger, and Angulo, the back seat passenger, rolled their windows down initially.[4] (Ex. 2A, 1:00.) Speaking through Angulo's window, Deputy Tadlock said that he had pulled the car over because it had crossed the fog line a few times. He asked

---

[3] The timing of the fog-line violations is unclear. Deputy Tadlock does not point them out in the dashboard camera video, and they perhaps occurred before he turned the dashboard camera on.

[4] Deputy Tadlock testified that only Angulo rolled his window down, which he found suspicious. Given my finding that Linaman also rolled her window down (albeit a second or two after Angulo began rolling his window down), as seen on the body camera video, I do not consider this as a factor in the reasonable-suspicion analysis.

Trimble, the driver, for his license, registration, and insurance. At some point, Linaman rolled her window back up.

Trimble handed his license and registration to Deputy Tadlock, who observed Trimble's hand shaking. Trimble said that he was still looking for proof of insurance on his phone. Deputy Tadlock then asked Angulo and Linaman for identification. Linaman passed her identification card to Deputy Tadlock over her shoulder, without making eye contact, and Angulo's hand shook as he passed his license to Deputy Tadlock. Shortly thereafter, Angulo mentioned being cold, adjusted his hooded sweatshirt so that the hood covered his ears, and crossed his arms over his chest.

Deputy Tadlock asked Trimble to join him in his patrol car. Almost as soon as Trimble entered the car, he noticed Deputy Tadlock's canine and commented, "Man, that dog is scary." He asked Deputy Tadlock if he had ever "sicced" the dog on anyone before, and Deputy Tadlock responded in the affirmative. (Ex. 1, 11:00.)

While waiting for the dispatcher to respond with the results from checking Trimble's license plate and driver's license, Deputy Tadlock asked Trimble about his travel plans. Trimble told him that Angulo's car had broken down somewhere in Nebraska, west of Omaha. When Deputy Tadlock asked where Angulo had been coming from, Trimble said that "they" had been in Las Vegas. (Ex. 1, 12:00.) Deputy Tadlock asked if Linaman had been driving back from Las Vegas with Angulo. Trimble explained that Angulo had been driving alone and that Angulo was Linaman's friend. Deputy Tadlock then asked what Angulo had been doing in Las Vegas. Trimble responded, "Gambling, I'm sure. She loves to gamble." Deputy Tadlock asked again if Linaman had been in Las Vegas with Angulo. Trimble clarified that Linaman had driven with him from near St. Paul, Minnesota, to pick Angulo up in Nebraska. He reiterated that Angulo was Linaman's friend.

Trimble still had not found proof of his car insurance, and he stated he would try looking in his email. (Ex. 1, 13:11.) Deputy Tadlock asked why Trimble had crossed the center line. Trimble said that he had been trying to light a cigarette and that he was tired from driving all day: it had taken six and a half hours to pick Angulo up, and they were now on their way back. Trimble explained that they were taking Interstate 29, as opposed to Interstate 35, because they were dropping Angulo off in Mankato, Minnesota, before heading home to the St. Paul area. Later, Trimble said that they were headed to Mankato "or something like that," explaining that he had Mankato "pinned" in his phone for directions because he knew they needed to take a different route back than if they were headed straight to St. Paul. (Ex. 1, 18:43.)

Trimble said that Angulo had agreed to pay him at least $300 for making the trip. He added that he thought "they" had done well at the casino. When Deputy Tadlock asked who "they" referred to, Trimble apologized and said that he was not sure why he kept saying "they," but it was perhaps because he, Linaman, and Angulo went to the casino together "a lot." Trimble went on to say that Linaman gambled often but that he was "too poor" to be a gambler. Trimble's carotid artery pulsed as he spoke with Deputy Tadlock.

After Trimble's driver's license check came back clean, his demeanor changed (although he did not necessarily become calmer). Trimble volunteered that he had been nervous about the results because he was behind on his child support.

Trimble's thumb shook as he swiped through his photos on his phone, looking for his insurance. Deputy Tadlock asked Trimble if he had found his insurance yet. He had not. Trimble was emphatic that he had insurance, however, explaining that he had just been "in trouble" for not having it. Deputy Tadlock suggested Trimble look in his email for his insurance information, instead of his photos. (Ex. 1, 19:19.) Trimble agreed that it was a good idea. (Ex. 1, 19:19.)

6

Trimble looked for his insurance, Deputy Tadlock returned to the passenger side of Trimble's car. After Deputy Tadlock indicated that he had no preference which window opened, Angulo rolled down the back seat passenger window. (Ex. 1, 20:21.) Deputy Tadlock returned Angulo's and Linaman's identification cards, and Linaman once again avoided making eye contact. Deputy Tadlock then asked Angulo about the group's travel plans. Angulo confirmed that Linaman and Trimble had picked him up somewhere in Nebraska after his car had broken down. He explained that he had flown to Las Vegas with his family to "hang out" and to go to Disneyland. He said that he had purchased a car from his wife's cousin because it was a good deal, and that he was driving his new car home when it broke down somewhere in Nebraska.

Deputy Tadlock asked Angulo where he lived. He said that he lived with his wife in Kasson, Minnesota, a small town between Rochester and Mankato, but that he and his wife had been having problems. When Deputy Tadlock asked where he was going tonight, Angulo said Mankato. He then elaborated that he would be dropped off in either Mankato or Kasson, depending on whether he stayed the night at his kid's apartment or at the house he shared with his wife.[5] Deputy Tadlock testified that Angulo spoke nervously.

---

[5] Deputy Tadlock testified that Angulo initially said they were driving to Kasson; then said Mankato; and then said Rochester, Mankato, or Kasson. While I found Deputy Tadlock credible, I do not credit this testimony. The video evidence provides a precise picture of what was said during the exchange with Angulo. Deputy Tadlock initially asked Angulo where he lived (not where he was headed), to which Angulo responded Kasson. (Ex. 1, 21:21.) When Deputy Tadlock asked where Kasson was, Angulo explained that it was near Rochester. (Ex. 1, 21:24.) He said that he lived in "Rochest—Kasson" with his wife, beginning to say Rochester but then correcting to Kasson. (Ex. 1, 21:26.) When Deputy Tadlock asked about his destination, Angulo responded Mankato with certainty. (Ex. 1, 21:31.) When pressed, he elaborated,

Deputy Tadlock returned to his patrol car to discover that Trimble had finally found his insurance information. Trimble said his hands were sweaty because he had been nervous about finding his insurance card. Deputy Tadlock then asked if he still planned to return to the St. Paul area that night. Trimble replied that he had been hoping to make it back, but he acknowledged that it might be best to stop and stay at a hotel, given that it was late, that he had already been pulled over once, and that it was dangerous to drive when tired. Deputy Tadlock then asked to see Trimble's eyes, which Deputy Tadlock said were a little red. Trimble explained that he was tired from driving all day. Deputy Tadlock gave Trimble a written warning ticket for crossing the center line and told him he was free to go.

When Trimble was halfway to his car, Deputy Tadlock stopped him. Deputy Tadlock asked Trimble some questions, which Trimble answered. Deputy Tadlock then asked for consent to search Trimble's car, which Trimble denied. With the help of two officers who had arrived a few minutes before (and after ordering Linaman, Trimble, and Angulo to sit in patrol cars), Deputy Tadlock performed a drug-dog sniff of Trimble's vehicle. The canine indicated that Trimble's car contained the odor of drugs. Deputy Tadlock and the other officers then searched Trimble's car. Among other things, they

---

"Mankato, Rochester, we're going to figure it out. I'm not sure if they're going to drop me off at my kid's apartment or if he was going to drop me off in Rochester—Kasson. . . . Kasson, actually, but it's in between Rochester" and Mankato. (Ex. 1, 21:36.) Rochester appears to be the nearest large city to Kasson, and it seems likely that Angulo referred to Kasson as Rochester because Deputy Tadlock was more likely to be familiar with the latter and that Angulo then corrected himself to be more precise. It is also clear that Angulo referred to only two possible destinations: his kid's apartment in Mankato or the house he shared with his wife in Kasson (near Rochester).

found a backpack containing more than twenty pounds of methamphetamine in the back seat.

## IV.  WHETHER THE SEIZURE VIOLATED LINAMAN'S RIGHTS

Linaman argues that prolonging the traffic stop to perform the drug-dog sniff constituted an unlawful seizure under the Fourth Amendment.[6]  The parties do not dispute the lawfulness of the initial stop, nor that the drug-dog sniff extended the already-completed stop.  At issue is whether Deputy Tadlock had reasonable suspicion to prolong the stop to perform the drug-dog sniff.  *See United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016) ("[I]n the absence of reasonable suspicion, police may not extend an otherwise-completed traffic stop . . . to conduct a dog sniff." (citing *Rodriguez v. United States*, 135 S. Ct. 1609, 1615-16 (2015))).

"To establish reasonable suspicion, 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' further investigation." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).  Reasonable suspicion requires "some minimal level of objective justification" of criminal activity that is "more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984); *Terry*, 392 U.S. at 27) (internal quotation marks omitted).  "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the

---

[6] As a passenger, Linaman has standing to challenge the initial stop of the vehicle and any unlawful extension of the stop.  *See Brendlin v. California*, 551 U.S. 249, 251 (2007) (holding that both the driver and the passenger are seized during a traffic stop); *see also, e.g.*, *United States v. Peralez*, 526 F.3d 1115, 1117, 1121 (8th Cir. 2008) (addressing a passenger's Fourth Amendment challenge based on an unlawful extension of a traffic stop).

evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). The officer "need not rule out the possibility of innocent conduct." *Id.* at 277. Courts must consider "the totality of the circumstances," rather than analyzing the suspiciousness of each factor in isolation. *Id.* at 274, 277.

Deputy Tadlock gave several reasons to support his suspicion that Trimble's car contained drugs. He testified that all three of the car's occupants were unusually nervous: Angulo's hand shook when he passed his license to Deputy Tadlock, and he spoke nervously; Linaman avoided eye contact; and Trimble's hand shook, his carotid artery visibly pulsed, and he had sweaty hands. Deputy Tadlock's suspicions were also aroused because Angulo had been in Las Vegas, a source city for drugs. Deputy Tadlock testified he thought it odd that Trimble looked for his insurance card in his photos on his smart phone, rather than his email. Deputy Tadlock believed that Angulo and Trimble gave inconsistent descriptions of their travel plans. He also found certain things Trimble said internally inconsistent. Finally, he found it implausible that Angulo had been in Las Vegas with his family and that he had visited Disneyland as part of his Las Vegas trip.

Nervousness, standing alone, is insufficient to establish reasonable suspicion, *United States v. Riley*, 684 F.3d 758, 763 (8th Cir. 2012); but it is a "valid factor" to consider, *United States v. Bloomfield*, 40 F.3d 910, 919 n.10 (8th Cir. 1994). The Eighth Circuit has recognized that the government can almost always point to nervousness to support reasonable suspicion, so "[g]enerally, . . . 'nervousness is of limited significance.'" *United States v. Jones*, 269 F.3d 919, 927-28 (8th Cir. 2001) (quoting *United States v. Fernandez,* 18 F.3d 874, 879 (10th Cir. 1994)). "[E]xtreme" nervousness, however, such as "sweating profusely on a cold day," is more suspicious than the usual nervousness that is commonplace when interacting with law enforcement. *Id.* at 928-29 (8th Cir. 2001) (holding that suspect did not display signs of unusual nervousness when he yawned, his voice cracked, his thumb shook, and he avoided eye

contact). Deputy Tadlock is an experienced officer who has had extensive drug interdiction training and has made an estimated 17,000 traffic stops during the course of his career. He testified that Linaman, Trimble, and Angulo were all more nervous than the average motorist during a traffic stop, a perception I credit based on his training and experience. Angulo's shaky hands and nervous voice, and Linaman avoiding eye contact, however, do not appear to rise to the level of "extreme" nervousness. Deputy Tadlock's own behavior demonstrated that the weather was quite cold that night, which explains Angulo's shaking while he spoke to Deputy Tadlock through the open car window. With regard to Linaman not making eye contact, it appears that nearly all of Deputy Tadlock's interaction with the vehicle occupants occurred at Angulo's back seat window. I therefore attach less significance to Linaman not making eye contact with Deputy Tadlock. And Trimble's nervousness is of limited significance, since other reasons (besides criminal activity) are just as likely to blame. As soon as he entered the patrol car, he indicated surprise and fear of Deputy Tadlock's dog. He was also nervous about the driver's license check, since he was behind in his child support, and his demeanor changed once the results came back clean. Finally, Deputy Tadlock observed Trimble's pulsing carotid artery and shaking and sweating hands during Trimble's anxious search for his car insurance on his phone. Trimble's nervousness over his inability to find his insurance is especially understandable given that he had just been "in trouble" over the matter.

Similarly, that Angulo had been in Las Vegas, a source city, is a relevant factor, but it is insufficient to establish reasonable suspicion standing alone. *See United States v. Beck*, 140 F.3d 1129, 1137-38 (8th Cir. 1998); *see also, e.g., Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam). I credit Deputy Tadlock's testimony that, based on his extensive training and experience, most drugs in the United States are transported from large, metropolitan cities near the southern border, such as Phoenix, Denver, and Las Vegas, and then move to more populous cities in the north. I recognize, however,

that a great number of law-abiding people travel to and from large, metropolitan cities every day and that the government is often able to point to travel from a "source city" as a factor. *See Reid*, 448 U.S. at 441 (noting that travel from a drug source city "describe[s] a very large category of presumably innocent travelers"); *Beck*, 140 F.3d at 1137-38 & n.3 (collecting cases identifying "a significant number of the largest cities in the United States as 'drug source cities'").

That Trimble looked for his car insurance in the photos section of his smart phone is hardly indicative of criminal activity. One can easily take a screen shot of an insurance card from an email or the insurance company's website, and in that case, the insurance card would reside in one's pictures (and one would not need to use mobile data service to access it). Although Deputy Tadlock testified that he had never seen someone look for their insurance in their photos, he did not explain why that made him suspicious that criminal activity was afoot, and I cannot imagine a reason. Deputy Tadlock did testify that he found it suspicious that Trimble did not think to look for his insurance in his email until Deputy Tadlock suggested it, but this rests on a faulty premise: Trimble mentioned checking his email a few minutes before Deputy Tadlock suggested it. I give no weight to this fact in analyzing reasonable suspicion.

The Eighth Circuit has recognized that inconsistencies between the driver's and passenger's stories may be the "most important[]" factor supporting reasonable suspicion. *United States v. Anguiano*, 795 F.3d 873, 877 (8th Cir. 2015). The inconsistencies between Angulo's and Trimble's stories here are minor, if they exist at all. Both Angulo and Trimble said that Angulo had been in Las Vegas, that his car had broken down somewhere in rural Nebraska, that Trimble and Linaman had driven to pick Angulo up, and that they were on their way to Mankato to drop Angulo off. Later, Angulo said that he would be dropped off in either Mankato or Kasson, depending on whether he stayed with his kid or his wife. But this is hardly inconsistent with Trimble's story, since

Trimble later told Deputy Tadlock that they were driving to Mankato or "something like that," explaining that he had used Mankato as a destination in his phone for directions. The only other potential inconsistency between the two stories involves what Angulo did in Las Vegas: Trimble said he was "gambling, I'm sure," and Angulo said he spent time with his family and went to Disneyland. First, these two explanations are not necessarily inconsistent: Angulo could have gambled, spent time with family, and gone to Disneyland during his trip. Second, any inconsistency between the stories is less suspicious than if the pair had been in Las Vegas together. Although Angulo likely discussed his trip with Trimble during the long car ride back, if he had not, Trimble would have no way of knowing what Angulo did in Las Vegas because Trimble was not there. Indeed, Trimble's response that he was "sure" Angulo gambled during his time in Las Vegas suggests that Trimble merely guessed at Angulo's itinerary.

Deputy Tadlock also thought Trimble's story internally inconsistent. Trimble said Linaman traveled from near St. Paul with him, not from Las Vegas with Angulo, but he also said "they" had been in Las Vegas, he thought "they" had done well at the casino, and "she loves to gamble" in response to a question about Angulo's activities in Las Vegas. Deputy Tadlock believed these comments suggested Linaman had been in Las Vegas with Angulo. But Trimble's use of "they" could have been referring to people other than Linaman who had been in Las Vegas with Angulo. And as Trimble explained, he said that Linaman loved to gamble because Angulo was a friend of Linaman's, not his. Moreover, Angulo confirmed Trimble's story that Linaman had not been in Las Vegas with him. Another internal inconsistency Deputy Tadlock noticed is that Trimble said Angulo was Linaman's friend but that all three gambled together "a lot." There are many ways to reconcile Trimble's statements: for example, Linaman might have known Angulo for a longer time, or she might spend time with Angulo aside from at the casino, unlike Trimble. Any inconsistencies in Trimble's story are minor.

The inconsistencies and uncertainties regarding travel plans here are slight and less suspicious than other Eighth Circuit cases discussing inconsistencies and finding reasonable suspicion.[7] Here, the main details in Angulo's and Trimble's stories aligned; there were no inconsistencies in the stated purpose of their trip (to rescue Angulo from car troubles), in their origin or destination cities, in the duration of the trip, in ownership of the car, in methods of travel, or in criminal history. Unlike in other Eighth Circuit cases, here, the "allegedly conflicting explanations of their travel plans" were reconcilable and not "mutually exclusive," and thus, less suspicious. *United States v. Winters*, 782 F.3d 289, 300 (6th Cir. 2015) (quoting *United States v. Richardson*, 385 F.3d 625, 631 (6th Cir. 2004)) (collecting cases).

---

[7] *See United States v. Murillo-Salgado*, No. 16-1959, 2017 WL 1359478, at *5 (8th Cir. Apr. 13, 2017) (driver said insurance company paid for rental car because of an accident; passenger said employer paid for rental car); *Woods*, 829 F.3d at 677, 680 (driver said they were traveling to Missouri; passenger said to Tennessee); *Anguiano*, 795 F.3d at 877 (driver said they borrowed a car from his aunt, passenger said from his friend Mario, and neither knew the last name of the person they borrowed a car from); *United States v. Quintero-Felix*, 714 F.3d 563, 566 (8th Cir. 2013) (driver provided changing locations for both the origin and destination of the trip, most of which contradicted passenger's account, and could not recall last name of his cousin they had visited); *Riley*, 684 F.3d at 761, 764 (minor internal inconsistencies regarding travel plans combined with misrepresentation of criminal drug history); *United States v. Bowman*, 660 F.3d 338, 342, 345 (8th Cir. 2011) (driver said they were going to Chicago for a week on business; passenger did not know where they were going or how long they were staying); *United States v. Gill*, 513 F.3d 836, 840, 844 (8th Cir. 2008) (driver said they were going to Ohio, passenger said to Iowa, and driver misrepresented his criminal history); *United States v. Linkous*, 285 F.3d 716, 718, 720 (8th Cir. 2002) (driver said they had towed a pickup truck to Texas and were now traveling back; passenger said they had towed a pickup truck to California); *United States v. Morgan*, 270 F.3d 625, 628, 631 (8th Cir. 2001) (driver said they had been in Arizona for four days, and the passenger said they had been in Arizona for a week, plus the driver could not remember if they had visited any city other than Phoenix), *abrogated on other grounds by Rodriguez*, 135 S. Ct. 1609; *United States v. Foley*, 206 F.3d 802, 804, 806 (8th Cir. 2000) (passenger said that he and the driver had flown to California; driver said they had driven).

The strongest support for Deputy Tadlock's suspicion of criminal activity comes from Angulo's suspicious travel plans. Deputy Tadlock found it questionable that Angulo had flown to Las Vegas with his wife and family but had driven back without them, especially since he later admitted to having marital troubles. Angulo explained that his wife's cousin had been selling a car that was too good a deal to pass up. Deputy Tadlock also thought it suspicious that Angulo said he went to Disneyland with his family at some point during the trip, since Disneyland is in Los Angeles. It seems reasonable, though, that Angulo and his family could have easily driven there during their Las Vegas trip—they were certainly closer to Disneyland in Las Vegas than they normally are at home in Minnesota. Deputy Tadlock also thought that Trimble and Linaman picking Angulo up, rather than a member of his family, was suspicious. But Deputy Tadlock did not ask whether Angulo's wife was back from Las Vegas, nor inquire into whether she was available to pick him up (it is possible that she had to remain at home with the kids or had no access to a vehicle).

Facts that are "perhaps innocent" when considered in isolation may warrant further investigation when taken together. *Arvizu*, 534 U.S. at 274 (quoting *Terry*, 392 U.S. at 22). Considering all the facts in totality, this is an extremely close case. The facts fall somewhere in between *United States v. Lebrun*, 261 F.3d 731 (8th Cir. 2001); *United States v. Fuse*, 391 F.3d 924 (8th Cir. 2004); and *United States v. Lyons*, 486 F.3d 367 (8th Cir. 2007); in which the court found reasonable suspicion, and *Jones*, 269 F.3d 919; and *Beck*, 140 F.3d 1129; in which the court did not. In *Lebrun*, the Eighth Circuit found reasonable suspicion based on the vehicle occupants' nervousness; pillows and food wrappers in the car, suggesting a long trip without stops; and the occupants' "vague and confused answers" regarding their travel plans and the purpose of their trip. 261 F.3d at 733-34. The driver's nervousness in *Lebrun*—profuse sweating on a cold day—was more "exceptional[]" than any of the nervousness on display here. *Id.* The

15

most important distinguishing factor in *Lebrun*, however, is that the suspects' stories of their travel plans were more vague and inconsistent than here: one of the passengers in *Lebrun* could not name which city in Kansas they were traveling from, even though they had supposedly been there to drop off her cousin at her aunt and uncle's house. *See id.* at 735 (Tunheim, J., dissenting). Also relevant is *Fuse*, in which the court found reasonable suspicion based on the following facts:

> (1) a strong odor of air freshener, which was significant to [the officer], because drug smugglers commonly use air freshener to mask the odor of controlled substances; (2) [the driver]'s prior arrest; (3) the car did not belong to [the driver] or [the passenger]; (4) [the driver] and [the passenger] were traveling from California, a "source state" for illegal narcotics; (5) [the driver]'s unusual explanation for traveling to Kansas City; (6) [the driver]'s and [the passenger]'s continued, unusual nervousness even after [the officer] advised them he was issuing only a warning citation; and (7) [the officer]'s observation of a mobile telephone and [caffeine tablets] in the car.

391 F.3d at 929. In *Fuse*, as here, the driver's travel plans were not that suspicious: the officer thought it odd that he arrived in Kansas City from California four days early for a job interview, that he brought a friend, and that his potential employer did not buy him a plane ticket. *See id.* at 926. But *Fuse* can also be distinguished since other factors not at issue here were present—e.g., use of a masking odor and a borrowed car. *See id.* at 929-30. Finally, in *Lyons*, the court found reasonable suspicion based on the defendant's inherently suspicious travel plans, an internal inconsistency in the defendant's story, and the defendant's large amount of luggage for a short trip. 486 F.3d at 372. The internal inconsistency in *Lyons* seems as minor as Trimble's use of "they" here: the defendant in *Lyons* initially said he had been visiting friends who "were students at Arizona State University, but later said that they did not attend the university but merely lived in Tempe." *Id.* But the inherent suspiciousness of the defendant's story was much greater in *Lyons* than here: the defendant's unusual itinerary "involved flying to Phoenix from

Ohio, staying three days in Phoenix, then renting a van in Phoenix and driving to Chicago, then dropping off the van and renting a different car to drive back to Ohio." *Id.*

On the other hand, in *Beck*, the court held that no reasonable suspicion existed to prolong the traffic stop to conduct a drug-dog sniff based on the following factors:

> (1) [the defendant] was driving a rental car which had been rented by an absent third party; (2) the [car] was licensed in California; (3) there was fast food trash on the passenger side floorboard; (4) no visible luggage in the passenger compartment of the automobile; (5) [the defendant]'s nervous demeanor; (6) [the defendant]'s trip from a drug source state to a drug demand state; and (7) [the officer's] disbelief of [the defendant]'s explanation for the trip.

140 F.3d at 1137. The officer thought it suspicious that the defendant was driving from California to North Carolina to find employment as a truck driver, when he could have found a similar job without driving such a long distance. *Id.* at 1139. But the Eighth Circuit found nothing suspicious about "interstate travel . . . to seek employment," noting that "[u]ntold numbers of Americans move for employment reasons every year." *Id.*; *see also United States v. Blaylock,* 421 F.3d 758, 768-69 (8th Cir. 2005) (holding in dicta that no reasonable suspicion would exist based on the defendant's "presence on a known drug corridor in a rental car" and the officer finding it suspicious that the defendant was traveling from Dallas to Phoenix for no purpose other than "hang[ing] out" and that the defendant was vacationing while unemployed). Here, Angulo's story—particularly, driving back from a family vacation without his family and going to Disneyland during a Las Vegas trip—could be considered more suspicious than in *Beck*. Moreover, here, Angulo's, Linaman's, and Trimble's nervousness was more unusual than in *Beck*, in which the officer estimated that in "twenty-five percent of the traffic stops he conducts[,] the detained motorist is at least as nervous as [the defendant] was." 140 F.3d at 1139. Finally, in *Jones*, the court found no reasonable suspicion based on the driver's

nervousness, which manifested in avoiding eye contact, a shaking thumb, and a cracking voice, and internal inconsistencies in the driver's story regarding his criminal history. 269 F.3d at 928-29. The court in *Jones* distinguished between inconsistencies regarding past conduct and inconsistencies regarding current travel plans (both at issue here), recognizing that the former is less suspicious than the latter. *Id.* at 928.

No Eighth Circuit case is directly on point. The facts here are closest to *United States v. Wood*, 106 F.3d 942 (10th Cir. 1997), which the Eighth Circuit relied on extensively in *Beck*, 140 F.3d at 1137-39. In *Wood*, the Tenth Circuit found no reasonable suspicion based on (1) the defendant's unusual nervousness, including rapid breathing and trembling hands; (2) the defendant traveling from a source state; (3) the car containing fast food wrappers and open maps; (4) the defendant's prior felony drug arrest ten years earlier; (5) the defendant's allegedly suspicious travel plans; and (6) a minor internal inconsistency in the defendant's story. 106 F.3d at 944, 946-48. The officer in *Wood* found it suspicious that the defendant took a two-week vacation while unemployed and that he flew to California with his sister but drove back to Kansas alone—even though he had the time to drive due to his unemployment and explained that he wanted to enjoy the scenery. *Id.* at 944, 947. Similarly, here, Deputy Tadlock was suspicious that Angulo had flown to Las Vegas with his family but was driving back to Minnesota without them—even though Angulo explained that he had bought a new car for a good price. The officer in *Wood* also thought it suspicious that the defendant originally said he had rented the car in San Francisco, but when confronted with rental papers saying the car had been rented in Sacramento, he immediately admitted his error. *Id.* The Tenth Circuit found this fact to provide little support that criminal activity was afoot because nothing "suggested that [the defendant] was trying to conceal . . . that he

had rented the car in a city known to be a source for narcotics." *Id.* at 947.[8] Rather, the defendant merely misspoke, much like Trimble's use of "they" here. Furthermore, the internal inconsistencies in Trimble's story are arguably reconcilable and thus more insignificant than the inconsistency in *Wood*, especially considering that Angulo confirmed the details of the trip set forth by Trimble.

It appears that Deputy Tadlock had a hunch that Trimble's car contained drugs before he pulled it over, following the car for more than seven minutes after it briefly crossed the center line, likely to gain a better reason to stop the car.[9] Whether his hunch became reasonable, articulable suspicion during the course of the stop is, as I noted earlier, a close call. I ultimately conclude, however, that the facts here—including the car occupants' unusual nervousness, that Angulo was traveling from a source city for drugs; minor, reconcilable inconsistencies between Angulo's and Trimble's stories; and the suspiciousness of Angulo's travel plans—could "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Reid*, 448 U.S. at 441. Accordingly, I find that Deputy Tadlock did not have reasonable suspicion to prolong the stop and conduct the drug-dog sniff.

---

[8] The Eight Circuit in *Lyons* did not consider a similar inconsistency in its reasonable-suspicion analysis—in that case, the driver initially said he was headed to Ohio, and when confronted with a rental agreement stating the car was to be returned in Chicago, the driver explained that he planned to spend a day in Chicago before ultimately heading home. 486 F.3d at 370, 372.

[9] I give little credit to Deputy Tadlock's testimony that he believed the driver might be impaired. The dashboard camera video shows that Trimble was driving the car normally and in no way was weaving. Moreover, Deputy Tadlock performed no field sobriety tests, nor asked the typical line of questions suggesting he seriously believed Trimble was impaired.

## V. *WHETHER SUPPRESSION IS AN APPROPRIATE REMEDY*

Linaman requested in a conclusory fashion that all evidence obtained "as a result" of the drug-dog sniff be suppressed, "including the results of the search of the vehicle and all statements made by" Linaman to the police. Doc. 39 ¶ 14; Doc. 44 at 10. Linaman did not set forth any details regarding the statements she would like suppressed, such as when and where they occurred, to whom they were made, and whether she received *Miranda* warnings beforehand. Moreover, neither party sets forth any argument or caselaw on the applicability of the exclusionary rule here, and at the hearing, the parties agreed that the only issue in dispute is the existence of reasonable suspicion. Docs. 39, 40, 44, 45.

Evidence obtained indirectly as a result of a Fourth Amendment violation, including physical evidence and verbal statements, may be suppressed as "fruit of the poisonous tree." *United States v. Riesselman*, 646 F.3d 1072, 1078-79 (8th Cir. 2011) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). "Only if the constitutional violation was 'at least a but-for cause of obtaining the evidence' is suppression of evidence the appropriate remedy." *United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008) (quoting *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007)). "[T]he defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence." *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007). Once the defendant establishes but-for causation, the burden of proof shifts to the government to demonstrate that the evidence was acquired "by means sufficiently distinguishable" from the constitutional violation "to be purged of the primary taint." *Riesselman*, 646 F.3d at 1079 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). The government can accomplish this by establishing the applicability of one of three exceptions to the "fruits" rule: the independent-source

exception, the inevitable-discovery exception, or the attenuation exception. *See United States v. Simpson*, 439 F.3d 490, 495-96 & n.2 (8th Cir. 2006); *United States v. Kelly*, 547 F.2d 82, 85-86 (8th Cir. 1977).

The physical evidence found during the search of Trimble's car, including the methamphetamine, "was tainted by the unlawfulness" of the prolonged detention and must be suppressed. *Beck*, 140 F.3d at 1140; *accord Jones*, 269 F.3d at 929. The prolonged detention is also the but-for cause of any statements made by Linaman after the drug-dog sniff: had Deputy Tadlock not prolonged the stop to conduct the drug-dog sniff, he would not have had probable cause to search Trimble's car, and Trimble and his passengers would have continued on their way to Mankato. *See, e.g.*, *United States v. Jensen*, 462 F.3d 399, 403, 408 (5th Cir. 2006) (holding that the unlawful extension of a traffic stop was the but-for cause of both the search that resulted in the defendant's arrest and the post-arrest search at the police station that resulted in the discovery of illegal drugs on defendant's person). Because the government does not argue that the attenuation doctrine or any other exception applies, suppression of Linaman's statements is also appropriate. *See United States v. Fraguela-Casanova*, 858 F. Supp. 2d 432, 451-52 (M.D. Pa. 2012) (holding that illegal seizure of passenger during traffic stop was but-for cause of officer's obtaining consent to search, discovering illegal cigarettes, arresting the passenger, and obtaining post-seizure "oral and written statements" and that government forfeited any argument based on the attenuation, inevitable-discovery, or independent-source doctrines by failing to raise them).

## VI. CONCLUSION

I respectfully recommend that the district court **grant** Linaman's motion to suppress (Doc. 39).

21

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. LCrR 59. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 2nd day of May, 2017.

Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa