# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br> vs. <br> SAMANTHA LINAMAN, <br><br> Defendant. | No. CR16-4102-MWB <br><br> **OPINION AND ORDER REGARDING MAGISTRATE'S REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |

_____

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................ 1
    *A. Procedural Background* ........................................................... 1
    *B. Factual Background* ................................................................ 3
II. LEGAL ANALYSIS ............................................................................ 8
    *A. Standards of Review* ............................................................... 8
    *B. Discussion* ............................................................................... 9
III. CONCLUSION ................................................................................ 10

## I. INTRODUCTION

### *A. Procedural Background*

The fighting issue, here, is whether a lawful traffic stop was extended beyond the time necessary to conduct a license check such that the use of a narcotics-detection dog to sniff around the exterior of the vehicle was a cognizable infringement of the defendant's Fourth Amendment rights. Presently, this case is before me on United States Magistrate

Judge Kelly K.E. Mahoney's Report And Recommendation on defendant Samantha Linaman's Motion to Suppress (docket no. 46). In her Report and Recommendation, Judge Mahoney recommends granting Linaman's motion and suppressing all evidence seized during the traffic stop search of a car in which Linaman was a passenger. Neither party has filed timely objections to Judge Mahoney's Report and Recommendation. I, therefore, undertake the necessary review of Judge Mahoney's Report and Recommendation.

On December 13, 2016, an Indictment was returned charging Linaman with conspiracy to distribute 50 grams or more of a methamphetamine mixture which contained 5 grams or more of pure methamphetamine (Count 1), in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846, and possessing with the intent to distribute a methamphetamine mixture which contained 5 grams or more of pure methamphetamine (Count 2), in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).

Linaman subsequently filed a Motion to Suppress (docket no. 39) in which she sought to suppress all evidence obtained as a result of the traffic stop search of a car in which she was a passenger. Linaman contends that prolonging the traffic stop for a dog sniff constituted an unlawful seizure under the Fourth Amendment. Linaman also argues that her post-arrest statements must be suppressed on grounds that they were the fruit of the poisonous tree.

The prosecution filed a timely resistance to Linaman's motion. Linaman's motion was referred to United States Magistrate Judge Mahoney, pursuant to 28 U.S.C. § 636(b). Judge Mahoney conducted an evidentiary hearing and then filed a Report and Recommendation in which she recommends that Linaman's motion be granted and I suppress all evidence obtained as a result of the traffic stop search of the car, as well as Linaman's post-arrest statements. In her Report and Recommendation, Judge Mahoney initially concluded that the deputy who conducted the traffic stop did not have reasonable suspicion to prolong the stop and conduct a drug-dog sniff. Accordingly, Judge Mahoney found that the physical evidence found during the search of the car was tainted by the

prolonged detention and should be suppressed. Similarly, Judge Mahoney found that the prolonged stop was the "but-for cause" of Linaman's statements and should be suppressed. Neither the prosecution nor Linaman have filed objections to Judge Mahoney's Report and Recommendation.

## B. *Factual Background*

In her Report and Recommendation, Judge Mahoney made the following factual findings:

> Deputy Tadlock has been a law enforcement officer for more than seventeen years, fifteen of which have been as a canine handler. He primarily patrols interstates with his canine. He estimated that he has made 17,000 traffic stops during his career. He has thrice attended a three-day criminal interdiction course with the Nebraska State Patrol, and he has completed all four phases of criminal interdiction training through a program called Desert Snow. He has also had training on interviews and interrogations.
>
> Through his criminal interdiction training, Deputy Tadlock learned about source states and source cities for drugs. His training taught him that 85% of drugs in the United States come from the southern border and are then transported north and east. Large shipments of drugs are moved to hub cities—big metropolitan cities—near the southern border, such as Phoenix, Denver, and Las Vegas; they are then disbursed to northern hub cities, such as Minneapolis, Minnesota; Sioux City, Iowa; Worthington, Minnesota; and Omaha, Nebraska.
>
> Deputy Tadlock worked his usual overnight shift on December 7, 2016, which was a cold night—less than twenty degrees—with even colder winds. A few minutes before midnight, Deputy Tadlock noticed a car that appeared to be speeding on northbound Interstate 29, just outside of Sioux City, Iowa. Deputy Tadlock began following the car to ascertain its speed. He determined that the car was not speeding. He continued to follow the vehicle, which had

Minnesota license plates. At one point, the vehicle changed lanes at the last second to avoid exiting the highway. After this, Deputy Tadlock activated his dashboard camera. The vehicle briefly crossed the center line, which Deputy Tadlock pointed out in the dashboard camera video. Deputy Tadlock continued to follow the vehicle for seven more minutes. After it crossed the center line for a second time—again, slightly—Deputy Tadlock pulled the vehicle over using his red and blue lights. At various points while Deputy Tadlock was following the vehicle, it also crossed the fog line three times.

Deputy Tadlock approached the passenger side of the vehicle. Both Linaman, the front seat passenger, and Angulo, the back seat passenger, rolled their windows down initially. (Ex. 2A, 1:00.) Speaking through Angulo's window, Deputy Tadlock said that he had pulled the car over because it had crossed the fog line a few times. He asked Trimble, the driver, for his license, registration, and insurance. At some point, Linaman rolled her window back up.

Trimble handed his license and registration to Deputy Tadlock, who observed Trimble's hand shaking. Trimble said that he was still looking for proof of insurance on his phone. Deputy Tadlock then asked Angulo and Linaman for identification. Linaman passed her identification card to Deputy Tadlock over her shoulder, without making eye contact, and Angulo's hand shook as he passed his license to Deputy Tadlock. Shortly thereafter, Angulo mentioned being cold, adjusted his hooded sweatshirt so that the hood covered his ears, and crossed his arms over his chest.

Deputy Tadlock asked Trimble to join him in his patrol car. Almost as soon as Trimble entered the car, he noticed Deputy Tadlock's canine and commented, "Man, that dog is scary." He asked Deputy Tadlock if he had ever "sicced" the dog on anyone before, and Deputy Tadlock responded in the affirmative. (Ex. 1, 11:00.)

While waiting for the dispatcher to respond with the results from checking Trimble's license plate and driver's

4

license, Deputy Tadlock asked Trimble about his travel plans. Trimble told him that Angulo's car had broken down somewhere in Nebraska, west of Omaha. When Deputy Tadlock asked where Angulo had been coming from, Trimble said that "they" had been in Las Vegas. (Ex. 1, 12:00.) Deputy Tadlock asked if Linaman had been driving back from Las Vegas with Angulo. Trimble explained that Angulo had been driving alone and that Angulo was Linaman's friend. Deputy Tadlock then asked what Angulo had been doing in Las Vegas. Trimble responded, "Gambling, I'm sure. She loves to gamble." Deputy Tadlock asked again if Linaman had been in Las Vegas with Angulo. Trimble clarified that Linaman had driven with him from near St. Paul, Minnesota, to pick Angulo up in Nebraska. He reiterated that Angulo was Linaman's friend.

Trimble still had not found proof of his car insurance, and he stated he would try looking in his email. (Ex. 1, 13:11.) Deputy Tadlock asked why Trimble had crossed the center line. Trimble said that he had been trying to light a cigarette and that he was tired from driving all day: it had taken six and a half hours to pick Angulo up, and they were now on their way back. Trimble explained that they were taking Interstate 29, as opposed to Interstate 35, because they were dropping Angulo off in Mankato, Minnesota, before heading home to the St. Paul area. Later, Trimble said that they were headed to Mankato "or something like that," explaining that he had Mankato "pinned" in his phone for directions because he knew they needed to take a different route back than if they were headed straight to St. Paul. (Ex. 1, 18:43.)

Trimble said that Angulo had agreed to pay him at least $300 for making the trip. He added that he thought "they" had done well at the casino. When Deputy Tadlock asked who "they" referred to, Trimble apologized and said that he was not sure why he kept saying "they," but it was perhaps because he, Linaman, and Angulo went to the casino together "a lot." Trimble went on to say that Linaman gambled often but that he

5

was "too poor" to be a gambler. Trimble's carotid artery pulsed as he spoke with Deputy Tadlock.

After Trimble's driver's license check came back clean, his demeanor changed (although he did not necessarily become calmer). Trimble volunteered that he had been nervous about the results because he was behind on his child support.

Trimble's thumb shook as he swiped through his photos on his phone, looking for his insurance. Deputy Tadlock asked Trimble if he had found his insurance yet. He had not. Trimble was emphatic that he had insurance, however, explaining that he had just been "in trouble" for not having it. Deputy Tadlock suggested Trimble look in his email for his insurance information, instead of his photos. (Ex. 1, 19:19.) Trimble agreed that it was a good idea. (Ex. 1, 19:19.)

Trimble looked for his insurance, Deputy Tadlock returned to the passenger side of Trimble's car. After Deputy Tadlock indicated that he had no preference which window opened, Angulo rolled down the back seat passenger window. (Ex. 1, 20:21.) Deputy Tadlock returned Angulo's and Linaman's identification cards, and Linaman once again avoided making eye contact. Deputy Tadlock then asked Angulo about the group's travel plans. Angulo confirmed that Linaman and Trimble had picked him up somewhere in Nebraska after his car had broken down. He explained that he had flown to Las Vegas with his family to "hang out" and to go to Disneyland. He said that he had purchased a car from his wife's cousin because it was a good deal, and that he was driving his new car home when it broke down somewhere in Nebraska.

Deputy Tadlock asked Angulo where he lived. He said that he lived with his wife in Kasson, Minnesota, a small town between Rochester and Mankato, but that he and his wife had been having problems. When Deputy Tadlock asked where he was going tonight, Angulo said Mankato. He then elaborated that he would be dropped off in either Mankato or Kasson, depending on whether he stayed the night at his kid's

apartment or at the house he shared with his wife. Deputy Tadlock testified that Angulo spoke nervously.

Deputy Tadlock returned to his patrol car to discover that Trimble had finally found his insurance information. Trimble said his hands were sweaty because he had been nervous about finding his insurance card. Deputy Tadlock then asked if he still planned to return to the St. Paul area that night. Trimble replied that he had been hoping to make it back, but he acknowledged that it might be best to stop and stay at a hotel, given that it was late, that he had already been pulled over once, and that it was dangerous to drive when tired. Deputy Tadlock then asked to see Trimble's eyes, which Deputy Tadlock said were a little red. Trimble explained that he was tired from driving all day. Deputy Tadlock gave Trimble a written warning ticket for crossing the center line and told him he was free to go.

When Trimble was halfway to his car, Deputy Tadlock stopped him. Deputy Tadlock asked Trimble some questions, which Trimble answered. Deputy Tadlock then asked for consent to search Trimble's car, which Trimble denied. With the help of two officers who had arrived a few minutes before (and after ordering Linaman, Trimble, and Angulo to sit in patrol cars), Deputy Tadlock performed a drug-dog sniff of Trimble's vehicle. The canine indicated that Trimble's car contained the odor of drugs. Deputy Tadlock and the other officers then searched Trimble's car. Among other things, they found a backpack containing more than twenty pounds of methamphetamine in the back seat.

Report and Recommendation at 3-9 (footnotes omitted). Upon review of the record, I adopt all of Judge Mahoney's factual findings.

## II. LEGAL ANALYSIS
### A. *Standards of Review*

A district judge must review a magistrate judge's report and recommendation in a criminal case under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); see also FED. R. CRIM. P. 59(b). Thus, when a party objects to any portion of a report and recommendation, the district judge must undertake a de novo review of that portion.

Any portions of n report and recommendation to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g., Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review a report and recommendation under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U2.S. 140, 150 (1985).

### *B. Discussion*

Here, because neither party objects to the Report and Recommendation, I have reviewed Judge Mahoney's Report and Recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"). After conducting my review, I am not "'left with [a] definite and firm conviction that a mistake has been committed,'" and find no reason to reject or modify the magistrate judge's recommendation. *Anderson*, 470 U.S. at 573-74.

Judge Mahoney reasonably determined that although there was probable cause to stop the car in which Linaman was traveling for possible traffic violations, *see United States v. Beck*, 140 F.3d 1129, 1137 (8th Cir. 1998) (holding that a traffic violation, however minor, creates probable cause to conduct a traffic stop of a vehicle), Deputy Tadlock prolonged the stop beyond the time reasonably required to investigate those violations and without reasonable suspicion of unrelated criminal activity and, thus, exceeded the constitutional limitations on such stops. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015). The facts of this case mirror those found in *Rodriguez*. In *Rodriguez*, a police officer had completed the routine tasks incident to a traffic stop, including checking the driver's license and the vehicle's registration and proof of insurance, and had handed the driver a written traffic warning. *Id.* at 1613. Only after these routine tasks were completed and the warning issued did the officer request permission to search the vehicle. *Id.* When the driver refused to consent, the officer

ordered the driver out of the vehicle and had him wait for a canine unit to arrive. "All told, seven or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs." *Id.* The United States Supreme Court noted that an officer is permitted to "conduct certain unrelated checks during an otherwise lawful traffic stop," but directed that he "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615. The Court observed, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 1614. In determining, whether Deputy Tadlock had reasonable suspicion to extend the stop, here, for a dog sniff, Judge Mahoney correctly focused on "the totality of the circumstances, in light of the officer's experience." *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994). The prosecution contends that reasonable suspicion to extend the traffic stop arose from several circumstances. Judge Mahoney, however, reasonably concluded that the totality of these circumstances did not create reasonable suspicion warranting the continued detention. *See United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (reasonable suspicion must be more than an inchoate hunch). Accordingly, I accept Judge Mahoney's well crafted and excellent Report and Recommendation which recommended that I grant Linaman's Motion to Suppress on the basis that Linaman's constitutional rights under the Fourth Amendment were violated.

### III. CONCLUSION

Therefore, for the reasons discussed above, I accept Judge Mahoney's Report and Recommendation and grant Linaman's Motion to Suppress (docket no. 46) as to all evidence seized during the traffic stop as well as Linaman's post-arrest statements.

**IT IS SO ORDERED**.

**DATED** this 22nd day of May, 2017.

                                                                  _____
                                                                  MARK W. BENNETT
                                                                  U.S. DISTRICT COURT JUDGE
                                                                  NORTHERN DISTRICT OF IOWA